**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **HORNBECK OFFSHORE TRANSPORTATION, LLC,** | ) ) ) | |
| **Plaintiff,** | ) ) | **No. 06-C-4386** |
| **v.** | ) ) | **JUDGE DAVID H. COAR** |
| **MANITOWOC MARINE GROUP, LLC,** | ) ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Hornbeck Offshore Transportation, LLC ("Plaintiff" or "Hornbeck") has

brought suit against Defendant Manitowoc Marine Group, LLC ("Defendant" or "Manitowoc")

under breach of contract, negligence, and strict liability theories. Now before this court are the

motions for summary judgment of Defendant (Doc. No. 24) and Plaintiff (Doc. No. 28), both

filed pursuant to Federal Rule of Civil Procedure 56. For the reasons stated below, Defendant's

motion for summary judgment is GRANTED and Plaintiff's motion for partial summary

judgment is DENIED.

**1.      FACTS**

This case involves an agreement entered into between Hornbeck and Manitowoc,

according to which Manitowoc was to construct a total of three tank barges intended for

petroleum transport.

a.    <u>Contract Terms</u>

On November 6, 2003, Plaintiff Hornbeck entered into a Contract with Manitowoc by which Manitowoc agreed to construct one "New Breed" 110,000 Barrel Tank Barge for Hornbeck.  Parker Aff., Ex. D ("Contract").  Soon thereafter, Hornbeck exercised its option under the Contract to purchase two additional vessels from Manitowoc.  The Contract incorporates by reference certain specifications and contract drawings for the vessels, both of which were prepared by Hornbeck.  *See* Contract, art. 2.1; Parker Aff., Ex. M.

The specifications required that the cargo motors were, among other things, "suitable for operation in an intrinsically safe marine environment," explosion proof, and adequate for meeting the requirements of Institute of Electrical and Electronics Engineers Standard 45, "Recommended Practices for Electrical Installations on Ships" ("IEEE 45").  *See* Parker Aff., Ex. G at 89, 99 ("Specifications").  The IEEE-45 standards that were incorporated into the Contract require that motors exposed to the weather or located where they would be exposed to seas, splashing or other severe moisture conditions should be watertight or protected by watertight enclosures.  *See* Pl.'s Facts Ex. 9 at 26 (Bryan Dep.").  The contract documents dictated that the motors for the pumps were to be housed inside a motor room, shielded from the elements.

The Contract allows for changes to be made via a change order form.  *See generally* Contract, art. 9.  All such changes were to be performed "under applicable provisions of the Contract Documents."  *Id.* art. 9.2.

The Contract's warranty provisions, of greatest importance to this matter, provide in most relevant part:

Art. 11.1: "Builder warrants to the Owner that all parts of the vessel, including materials, equipment and work fabricated by the Builder will be new, free from defects in workmanship and materials for a period of three hundred sixty-five (365) days, ...Builder will replace or repair such parts as may fail."

...

Art. 11.4: "Builder does not warranty any equipment or material purchased by Builder from a supplier or manufacturer for installation in the Vessels is free from manufacturer's defects and deficiencies. Where a standard commercial warranty is available, Builder agrees to transfer and assign any such warranties to Owner. If required by the Owner, the Builder shall furnish satisfactory evidence as to the kind and quality of materials and equipment."

...

Art. 11.7: voids any of Manitowoc's warranties with respect to "any material or equipment specified and/or furnished by Owner or any labor performed by others at the direction or request of Owner, including, but not limited to, design, specifications, and/or installation, and Builder specifically disclaims any warranties, expressed or implied, in connection with the foregoing."

Art. 11.8: "Builder shall not be liable for any defects in any engine, engine accessory, item of machinery, equipment, gear or fittings, or any other items manufactured by others, and Owner shall look to the manufacturer and supplier thereof for redress ... Provided, however, Builder shall warrant for three hundred sixty-five (365) days after the Delivery and acceptance of a Vessel that any installation and workmanship done by it to install any items manufactured by others shall be done in a workmanlike manner free and clear of all defects ... All previously stated terms and conditions of warranty repair and deductibles shall apply to this warranty."

...

Art. 12.1: "THE BUILDER MAKES NO GUARANTY OR WARRANTY BEYOND THOSE SPECIFIED IN THIS CONTRACT. THE WARRANTIES SET FORTH IN ARTICLE 11 ARE THE EXCLUSIVE WARRANTIES OF BUILDER AND BUILDER HEREBY DISCLAIMS ANY OTHER WARRANTIES OR GUARANTEES, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY

OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE."

The Contract also limits damages, stating that "[i]n no event shall Builder be liable to Owner or Owner's Indemnitees for consequential, incidental, special or indirect damages for any reason whatsoever other than as specifically provided in this Contract." *Id.*, art. 12.2. Finally, the Contract dictates that the agreement "shall be governed by and construed in accordance with the laws of the State of Wisconsin." *Id.*, art. 15.1.

b.    Pump and Motor Change Order

In late July 2003, Plaintiff investigated with Stanley Shamosh ("Shamosh") of Shamosh Equipment Corp. ("Shamosh Equipment") the possibility of changing to a "pump-and-motor setup," in which the pump motor would be vertically mounted directly on top of the pump. This arrangement would move the motors outside of the motor room, obviating the need for a motor room but exposing the motors to the elements. Shamosh recommended to Hornbeck pumps manufactured by Leistritz Corporation ("Leistritz"). On December 11, 2003, Shamosh provided Hornbeck with a price quotation for two cargo pumps made by this manufacturer, along with the specifications for compatible vertically mounted motors. Manitowoc was not a part of these discussions between Hornbeck and Shamosh Equipment.

On December 12, 2003, Hornbeck requested that Manitowoc take steps to adopt the two Leistritz cargo pumps. After some discussion, the Contract was amended via a January 20, 2004 change order to place the pumps on deck with vertically mounted motors. Parker Aff., Ex. Q ("Change Order"). This change order form referenced and attached the quote from Shamosh Equipment. After the change order had been agreed upon, Manitowoc requested quotes via a purchase technical specification form outlining the technical demands for the equipment. Parker

Aff., Ex. M ("PTS"). This PTS form was adjusted to conform to the technical specifications already provided by Shamosh Equipment. *See* Parker Aff., Ex. N. The PTS stated that the pump motors needed to be IEEE 45 above deck marine duty compliant. *Id.* at 6.

In response, Shamosh Equipment provided Manitowoc with the previously discussed Liestritz pumps, combined with motors manufactured by U.S. Electrical Motors ("U.S. Electric")[1] and distributed by Flowserve. In documentation provided to Shamosh, U.S. Electrical certified that the motors were IEEE 45 compliant. *See* Parker Aff., Ex. R. Shamosh, in turn, advised Hornbeck that "U.S. Electrical Motors have been used by [Shamosh] and others in the marine above-deck x-proof [explosion-proof] service, with very satisfactory results." Parker Aff., Ex. Contract at 4. Shamosh also provided the U.S. Electrical certification to Manitowoc.

      c.    <u>Problems following delivery</u>

Pursuant to the Contract and Change Order, Manitowoc constructed three barges for Hornbeck using the pump and motor configuration supplied by Shamosh Equipment; the ENERGY 11103, the ENERGY 11104, and the ENERGY 11105. The barges were substantially constructed in Sturgeon Bay, WI.

Plaintiff began to experience problems with some of the pump motors starting in August of 2005. In September of 2005, Hornbeck and Manitowoc resolved an issue regarding an "overtorqued adjusting nut" on one of the motors. On January 13, 2006, Plaintiff contacted

---

[1]Though not entirely clear from the record, U.S. Electrical appears to be a brand of or division within Emerson Electric Company. While references are made to both Emerson and U.S. Electrical throughout the record, for purposes of this opinion we assume that U.S. Electrical Motors was the manufacturer of the motors in question and that any additional fine tuning of this attribution is unnecessary.

Shamosh and Manitowoc regarding "numerous failures" with one of these motors. *See* Parker Aff., Ex. V. Throughout this period, Hornbeck communicated "directly and regularly with Shamosh and U.S. Electric[al] regarding its investigation into the alleged problems with the cargo pumps." Manitowoc's Facts ¶ 58.

In a letter dated May 9, 2006, U.S. Electrical advised Shamosh that, contrary to its original certification, the motors it had provided did not meet IEEE 45 requirements, and that failure of the motors could be attributed to "severe moisture conditions." Parker Aff., Ex. BB. The letter also states that the motors used could never have been independently watertight, and instead needed to have been housed in a watertight enclosure in order to comply with the standard. Plaintiff contacted Defendant once again regarding the motor problems on July 7, 2006. *See* Parker Aff., Ex. W.

d.   Complaint and Damages

Plaintiff filed this Complaint on August 14, 2006. In it, Plaintiff advances several claims related to the failure of the pump motors, including breach of contract (Count I), negligence (Count II), and strict liability (Count III). In its "Rule 26 Disclosures," Hornbeck claimed "$145,063 in past lost Revenues, $400,365 in lost time due to shipyard repairs," and stated that it would provide additional "Damage Computations."

On August 14, 2006, Plaintiff filed a separate lawsuit in the United States District Court Eastern District of Louisiana against Shamosh and U.S. Electrical from losses resulting from the above facts, as well as losses from motors used in two barges not constructed by Manitowoc.

## 2.    SUMMARY JUDGMENT STANDARD

A party seeking summary judgment has the burden of showing, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact that would prevent judgment as a matter of law.  Fed. R. Civ. P. 56(c).  On a motion for summary judgment, courts "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party."  *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001).

Even so, the nonmoving party may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather, he or she must go beyond the pleadings and support contentions with proper documentary evidence.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The successful non-movant must do more than raise a "metaphysical doubt" as to the material facts, *see Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted), and instead must present definite, competent evidence to rebut the motion, *see Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); Fed. R. Civ. P. 56(c).

Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  A non-moving party who bears the burden of proof on an issue must demonstrate by specific factual allegations that there is a genuine issue of material fact in dispute.  *McMillian v. Svetanoff*, 878 F.2d 186, 188 (7th Cir. 1989).  This evidence provided by the non-movant must be sufficient to enable a

reasonable jury to find in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

Mere allegations in the pleadings, unsupported by record evidence, cannot create an issue of fact defeating summary judgment. *Burrell v. City of Mattoon*, 378 F.3d 642 (7th Cir. 2004). The Seventh Circuit has made it clear that "self-serving affidavits, without any factual support in the record, are insufficient to defeat a motion for summary judgment." *Palmer v. Marion County*, 327 F.3d 588 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) as stating that "[t]he object of [Rule 56(e) ] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). However, rebuttal can come from the allegations of a complaint, but only to the extent that they are based upon the plaintiff's personal experience. *See Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (requiring that allegations are admissible at summary judgment under 56(e) so long as they are "based on personal knowledge and [set] forth specific facts showing that there is a genuine issue for trial"). The fact that those statements may be "self-serving" is not a valid grounds for deeming them inadmissible. *See id.*

Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986).

**3.      ANALYSIS**

This case centers on the failure of the barges' pump motors. Plaintiff Hornbeck attributes this problem to Defendant Manitowoc's failing to ensure that the motors met the standards of

IEEE-45, as required by the Contract and related documents.  Manitowoc responds that, if a failure to meet the IEEE-45 standards caused the motor problems, that failure was caused by specification or manufacturing errors from which it is protected by warranty disclaimers.  *See generally* Contract, arts. 11.4, 11.7, 11.8.  In the alternative, Manitowoc asserts various procedural or remedial deficiencies in Plaintiff's claims.

     a.  <u>Applicable Law</u>

The parties have not disputed that the choice of Wisconsin law found in article 15.1 should be enforced and applied in interpreting the Contract.  The laws of Wisconsin provide no basis for second-guessing that selection.  *See Bush v. Nat'l Sch. Studios, Inc.*, 139 Wis.2d 635, 642, 407 N.W.2d 883 (1987); *see also* Wis. Stat. § 401.105(1) ("[W]hen a transaction bears a reasonable relation to this state and also to another state ... the parties may agree that the law either of this state or of such other state ... shall govern their rights and duties.").

To prevail in a breach of contract claim under the laws of Wisconsin, a plaintiff must establish that: (1) a contract exists; (2) defendant's actions violate the express terms of that contract; and (3) the breach is material and resulted in injury.  *Walgreens Co. v. Sara Creek Prop. Co.*, 775 F.Supp. 1192, 1195 (E.D. Wis. 1991).  Though not addressed by the parties, it should also be noted that the contract at issue is one for products rather than services, as its predominant purpose was to convey a number of barges to Plaintiff.  *See Linden v. Cascade Stone Co., Inc.*, 283 Wis.2d 606, 619-22, 699 N.W.2d 189, 195-97 (2005) (describing the appropriate test for mixed service and product contracts); *see also Trinity Lutheran Church v. Dorschner Excavating, Inc.*, 289 Wis.2d 252, 710 N.W.2d 680 (Wis. App. 2006) (finding service contract where house builder merely coordinated services and was not ultimately responsible for

providing the finished product).  Therefore, as a general matter the laws of the UCC as adopted

by Wisconsin are applicable, *see* Wis. Stat. § 402.102, and the judicial doctrine of economic loss

shall be considered, *see, e.g., Grams v. Milk Prods. Inc.*, 2005 WI 112, ¶ 15, 283 Wis.2d 511,

699 N.W.2d 167 (explaining why the doctrine is not applicable to services contracts).

   b.  Manitowoc generally liable to ensure that contractual terms were met

   Manitowoc was liable for ensuring that the alterations found in the Change Order

satisfied all terms of the Contract.  *See* Contract, arts. 9.2; 9.3 ("Changes in the Work shall be

performed under applicable provisions of the Contract Documents, and Builder shall proceed

promptly on those, unless otherwise provided in the Change Order.").  The Change Order

contains no explicit language that might remove the strictures of IEEE 45, *see* Parker Dep. Ex. Q

("Change Order"), and there is no evidence that such alteration might be implied from

surrounding negotiations.  Therefore, as a general matter, Manitowoc was liable for ensuring that

the installation of the pump motors satisfied the requirements of IEEE 45.

   Defendant primarily maintains that it is protected from liability by contractual clauses

disclaiming liability with respect to: (1) all implied warranties, *see* Contract, art. 12.1; (2) pump

motor problems falling under warranties of a third-party manufacturer, *see id.* art. 11.4 and/or

art. 11.8; and (3) problems caused by Hornbeck's specifications, *see id.* art. 11.7.  Plaintiff

challenges these waivers, claiming that under Wisconsin they cannot effectively contradict

explicit warranties found elsewhere in the contract.  *See* Pl.'s Resp. at 6 (citing Contract, arts.

2.7, 11.1-11.12; *Murray v. Holiday Rambler, Inc.*, 265 N.W.2d 513, 519 (Wisc. 1978)).  It is true

that the Contract contains explicit warranties that would survive a general disclaimer.  *See*

Contract, art. 2.7 (warranting that construction accord with "good shipbuilding practices in order

to meet the appropriate standards of construction and levels of finish for the class and type of vessel required herein"); *see also id.*, art. 11.1 *et seq.*  However, this Court favors Defendant's reading of the Contract and relevant law on this issue, for while such an explicit warranty cannot be waived by a general disclaimer, the principle has no impact in this instance.

First of all, the holding of *Murray* is that an *express* warranty cannot be eliminated by a general disclaimer, so Plaintiff's argument has no impact on the general disclaimer against *implied* warranties.  We therefore find article 12.1 of the Contract valid and enforceable in that sense, and strike Plaintiff's claims insofar as they are brought under any implied warranties.  *See* Compl. ¶ 35.  Second, while the court in *Murray* upheld an express warranty despite a general disclaimer with which it conflicted, in this instance the disclaimer does not purport to invalidate the warranty so much as modify it, a contractual situation not addressed in that decision. Therefore, Plaintiff has provided no reason to invalidate the disclaimers, so long as the clear language of the clauses can be read as compatible, *i.e.*, that the express warranties are modified but not eliminated by articles 11.4 and 11.7.  *See* Wis. Stat. § 402.316(1) (West 2003) ("Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other"); *see also DeWitt Ross & Stevens, S.C. v. Galaxy Gaming and Racing Ltd.*, 273 Wis.2d 577, 597, 682 N.W.2d 839, 849 (2004) ("Contracts must be read in such a manner as to give a reasonable meaning to each provision and without rendering any portion superfluous.").

This Court therefore finds that the warranty disclaimers are valid insofar as they limit Defendant's potential liability to problems related to installation, rather than problems of third-party manufacturer or those intrinsic to design and specification.  We must therefore determine

whether the scope of these disclaimers applies to this case or, put another way, whether the pump motor failures can be attributed to problems that arose from installation rather than the manufacturer or design problems from which Manitowoc has protected itself.

    c.   The U.S. Electrical motor was constructively specified by Hornbeck

Article 11.7 of the Contract effectively nullifies Manitowoc's express and implied warranties with respect to "material or equipment specified and/or furnished by Owner...including, but not limited to, design, specifications, and/or installation." Contract, art. 11.7; *see also* Wis. Stat. § 402.316 (allowing for the exclusion or modification of warranties). Defendant alleges that the engines in question were "specified" by Plaintiff, therefore triggering this language and relieving Manitowoc of any relevant warranty. Plaintiff denies this, contending that the Contract and Change Order did not specifically reference the installed pump motors, and that it was Manitowoc's own choice to purchase the motors from Shamosh Equipment that then failed to meet the IEEE 45 standards.

All relevant decisions with respect to the pump and motor had been made prior to Manitowoc's awareness of the new configuration. Before Manitowoc was even involved, Hornbeck had already shifted to an on-deck arrangement, selected the Leistritz pump for the new configuration, reviewed the change with Shamosh, and determined what equipment would be needed to facilitate it. *See* Shamosh Dep. at 14-19, 27; *see also* Hornbeck's Facts Resp. ¶¶ 20-24 (objecting only to Defendant's characterization of pre-Change Order communication as "negotiation(s)"). Hornbeck tries to downplay the degree to which the U.S. Electrical motors where selected by name prior to Manitowoc's involvement. *See, e.g., id.* ¶ 24. However, Plaintiff cites only to testimony by Hornbeck project manager Paul Lamourie, who stated "not

that I recall" in response to the question of whether U.S. Electrical motors were discussed prior to Manitowoc's involvement, and an email to Manitowoc that initiated the Change Order but failed to mention the new motor. Plaintiff's attempt to contradict Defendant on this point is not compelling. Shamosh more clearly recalls that the pump and motor had both been selected prior to Manitowoc's involvement. *See* Shamosh Dep. at 27. It is also apparent that the pump and motor were generally treated together as a single unit, supplied by Shamosh Equipment and designed around the Leistritz pumps, thus making the importance of the motor's name secondary to specification of the pump.[2] *See* Lamourie Dep. at 136. Therefore, whether or not Hornbeck specified the installed motors by name, the new technical specifications and the attachment of the Shamosh Equipment quote nonetheless precluded any freedom of action on Manitowoc's part with respect to motor selection.

More importantly, the ultimate manufacturer of the motors is of minimal importance relative to the existence and satisfaction of the IEEE 45 requirements. Under a fair reading of the protections offered by article 11.7, a specification constraining the selection of a part for installation is largely the same as selection of the motor itself, for liability purposes. Therefore, whatever the name of the pump motors that were eventually installed, the allegation is that they were not IEEE 45 compliant or, alternatively, that reliance on the IEEE 45 standard as a means

---

[2]This is also why Plaintiff's reliance on the original specifications, which call for the motors to be manufactured by a company called "Marathon Electric," is misplaced. *See* Specifications at 99. Though the Change Order and later communications with Manitowoc may not have been as clear as possible on the use of U.S. Electrical motors, the Contract nonetheless allowed for the use of "Owner approved equivalent" motors. *Id.* Therefore, so long as Hornbeck made clear that the Leistritz pumps were to be used, and that it approved of the motors recommended by Shamosh Equipment, this aspect of the Change Order amounts to new specifications consistent with the original terms of the Contract. *See* Def.'s Facts ¶ 39 (quoting Hornbeck as advising Manitowoc that "the motors specified by Shamosh are satisfactory").

of ensuring adequate water protection was misplaced. With respect to either of these questions, the motors' ability to avoid water damage has less to do with the name of the motor selected than the selection and enforcement of the IEEE 45 requirement.

At no point did Manitowoc make the mistake of dropping this specification that had been added in the Change Order, and it was therefore binding on any manufacturer or supplier involved in the project. Hornbeck admits that the quotation attached to the Change Order "lists certain performance requirements" for the motors. Though the document does not describe the U.S. Electrical motors by name, these "certain performance requirements" had already been tailored to previous communications with Shamosh Equipment. Indeed, the earlier quote served as the basis for any attempt made by Manitowoc to change the equipment that was to be installed. *See generally* Parker Aff., Ex. N (in which Lamourie, on behalf of Hornbeck, suggests that the PTS "track with the performance capabilities of the Leistritz pumps as quoted by Shamosh," and discourages Manitowoc from looking for "competitive pricing or an 'or equal'"). Through this process, Hornbeck constructively dictated that whatever motor Shamosh supplied would be the one used in the vessels. *See* Manitowoc's Facts ¶¶ 32-35. As far as determining whether the selection of the pump motor was "specified," and ultimately determining Manitowoc's liability, it is sufficient that Hornbeck all but named the motors to be used and that Manitowoc had no say in the matter.

It is certainly true that, to some extent, Manitowoc was required to ensure that installation decisions during construction of the barges would be consistent with the overall contractual requirements. *See, e.g., Thomsen-Abbott Constr. Co. v. City of Wausau*, 9 Wis.2d 225, 100 N.W. 2d 921 (Wisc. 1960). However, this principle cannot be expanded into a

generalized duty to second-guess every design determination that Hornbeck made, as such expansion would swallow up the distinction between designer and builder, nullifying the contractual language of article 11.7.  *See DeWitt Ross & Stevens*, 682 N.W.2d at 849 ("Contracts must be read in such a manner as to give a reasonable meaning to each provision and without rendering any portion superfluous.").

While Plaintiff repeatedly denies that the selection of the U.S. Electrical motors amounted to a specification, it has provided no compelling evidence in support.  Therefore, to the extent that any failures in the motors can be attributed to errors in relevant specifications, they are to be attributed to the Plaintiff, qualifying Defendant for the Contract's disclaimer of warranty.

d. Whether it was a defect of a third-party manufacturer

Defendant maintains that it is also protected from liability by disclaimers of liability related to the work of third party manufacturers.  To the extent it is relevant, paragraph 11.4 of the contract negates Manitowoc's warranties with respect to "manufacturer's defects and deficiencies" in equipment or material purchased for installation in the barges.  Also potentially relevant is a more specific rejection of warranties related to engine installation.  *See* Contract, art. 11.8 (exempting warranties related to "any defects in any engine, engine accessory, item of machinery").

While there is some dispute as to when defects in the pump motors became apparent, or whether those defects can be directly linked to the demands of IEEE 45, there is no dispute that the motors were warranted several times over to meet those demands by third parties.  Shamosh Electric acknowledges its awareness of IEEE 45, its reliance on the assurances from Flowserve

and U.S. Electrical Motors, and its conviction at the time that there was no reason to doubt compliance. *See* Shamosh Dep. at 28, 84; *see also* Parker Aff., Ex. Contract (in which Shamosh advises that "U.S. Electrical Motors have been used by [Shamosh] and others in marine above-deck [explosion-proof] service, with very satisfactory results"). Over time this opinion changed, so that while Shamosh had recommended the motors for on-deck use, now they no longer do. *See id* at 95-96. The warranties provided by Shamosh were not independent of the underlying design and installation; instead, they fully appreciated the design specifications involved and – at that time – were fully confident in the motors' ability to meet them. *See, e.g.*, Lamourie Dep. at 135-37 (making clear that Shamosh was involved in the design configuration and that Shamosh nonetheless believed that the U.S. Electrical motor was appropriate for the task). Whether or not this evaluation changed over time is irrelevant to the fact that, at the time Manitowoc ordered them, the motors were offered up as satisfying Hornbeck's needs. For this reason, the fact that they were not ultimately watertight amounted to "manufacturer's defects and deficiencies" fitting the liability exception offered Manitowoc under article 11.4.

Similarly, U.S. Electrical stated that the motors met the standards when they were installed, though they later reversed their position on this. Manitowoc Facts ¶¶ 44-45, 60. The parties assumed that the motors would be watertight independent of other design considerations of the barge. *See* Manitowoc's Facts ¶ 28 ("U.S. Electrical was aware at all times of the placement of the cargo pump motors in an above-deck area and that some were required to be both explosion proof and waterproof."). There is no reason to look further into the nature of U.S. Electrical's warranties; Hornbeck's design specifications demanded that the pump motors be IEEE 45 compliant, and Manitowoc received assurances that the motors installed met that

standard. To the extent that the motors nonetheless failed to be sufficiently watertight, there is simply no basis for attributing that failure to Defendant's installation.

Despite the role of third parties in providing and warranting the pump motors, Plaintiff faults Manitowoc for taking "no independent actions to verify that the motors were compliant with the requirements of the Specifications." Pl.'s Resp. at 5. However, the Contract expressly allows for Defendant to avoid liability where a product failure is attributable to third party manufacture, effectively shifting that liability to the manufacturer's warranties. *See* Contract, art. 11.4. To move beyond these guarantees and independently test the motors is not supported by law or contractual language, and to do so would defeat the purpose of including the disclaimer in the first place. *See DeWitt Ross & Stevens*, 682 N.W.2d at 849. In fact, while Plaintiff now condemns Manitowoc for "solely...tracking the language of the Specifications in the PTS it sent to vendors to obtain pricing," when questions were raised about the technical capabilities of Shamosh Equipment's products, Hornbeck quashed the very diligence it now demands, presumptively stating that their motors were satisfactory. *See* Def.'s Facts ¶ 39.

For these reasons, any alleged failure of the pump motors in meeting the demands of IEEE 45, insofar as it is attributable to failings of the motors themselves, falls to the manufacturers who warranted them for that use and according to those standards.

e. No liability can be attributed to Manitowoc that is not precluded by warranty disclaimers

As discussed above, the new pump arrangement and the pump motors it incorporated – or at least their technical specifications – were chosen by Hornbeck. Therefore, to the extent that the failure of the motors can be attributed to their selection and design layout, that problem can be laid at Hornbeck's feet and Manitowoc is protected by article 11.4 of the Contract. The

supplier and manufacturer of the motors expressly warranted their appropriateness for on-deck use according to IEEE 45 standards. Therefore, to the extent that the failures can be attributed to their manufacture, Manitowoc is protected by article 11.7 of the Contract. Hornbeck's only hope in attributing liability to Manitowoc is to show that, despite the general appearance of the record and the language of these warranty disclaimers, the errors can nonetheless be attributed to the motors' installation rather than their specifications or manufacture.

None of the evidence introduced by Plaintiff provides a sufficient factual basis on which a jury could avoid warranty disclaimer protections and attribute fault to Manitowoc. In attributing fault for the motors' inability to function properly on-deck, there is no indication that installation failures were to blame. Hornbeck called for IEEE 45 compliance, and seems to have made no other move to ensure that the on-deck arrangement would be adequate for its purposes. Manitowoc carried out this demand at installation by ensuring that the installed motor met this requirement and received assurances to that effect. Plaintiff would argue that Hornbeck should have second-guessed either the design's reliance on only IEEE 45's protections, or the manufacturer's assurance that the standard was met in this instance. However, there is simply no evidence that liability should be allotted in this manner.

Plaintiff's evidence that this was an installation failure is unavailing, as it has not been able to indicate what Manitowoc did wrong during the installation proses that was not covered under the warranty disclaimers. *See, e.g.*, Lamourie Dep. at 169-70 (in which deponent fails to provide any response to the question "can you point to anything Manitowoc did incorrectly with respect to the cargo pump motors or the cargo pumps?"). Instead, Plaintiff has repeatedly pointed to evidence arguably showing that the motors, "as installed," did not or could not meet

the IEEE 45 standards.  *See generally* Pl.'s Mem. at 5; Hornbeck's Facts ¶ 16 (citing Lamourie Dep. ¶ 16); *id.* ¶ 18 (citing Shamosh Dep. at 84-85); *id.* ¶ 23 (citing Bryan Dep. at 155-45, 188). Plaintiff asserts that this is sufficient for "establishing that Manitowoc breached the contract." *See* Pl.'s Resp. at 5.  However, proof of this fact does nothing to draw the necessary fine line distinction between errors of specification, installation, or manufacture required to determine warranty disclaimer applicability.

For example, Plaintiff focuses on the testimony of James Bryan, an employee speaking on behalf of U.S. Electrical, who inspected one of the barges after the problems were apparent. *See* Bryan Dep. at 188 (testifying that "as installed these motors are not compliant with IEEE 45").  The fact that Plaintiff is able to cite to the testimony of an employee of U.S. Electrical – an interested party and one involved in concurrent litigation over the facts of this case – is not particularly compelling evidence of the proper attribution of blame in this case.  More importantly, Bryan's testimony simply does not reach the ultimate issue in this case, which is not whether or not the motors "as installed" were IEEE 45 complaint, but rather whether failure to meet that standard can be blamed on the installer.  Plaintiff has cited to no portion of Bryan's testimony that gets to this essential issue.  Therefore, his testimony can be accepted at face value and yet fail to contradict Defendant's claim that it is protected from liability by the warranty disclaimers.

Other testimonials that Plaintiff puts forth as proving liability are simply not on point. Similar to the Bryan testimony is that of Shamosh, who states that the motors were not IEEE-45 compliant "as installed."  *See* Parker Aff., Ex. D at ("Shamosh Dep.").  Again, this doesn't contradict Defendant's argument that the motors themselves failed to meet that requirement –

despite the warranties of Shamosh himself – or that Hornbeck should have arranged them differently in the barge to achieve IEEE-45 compliance. However, neither this, nor any of the other cited materials, approaches the question a factfinder would need to answer in order to move Manitowoc's actions outside the protective scope of the warranty disclaimers; whether or not Defendant's installation or workmanship is at fault under what remains of its warranties. Oddly, Plaintiff seems to be dismissive of the one piece of evidence that its case lacks. According to Hornbeck's formulation, the act of installing motors in accordance with a design that contravened IEEE 45, or using motors negligently manufactured or warranted, could all be attributed to Defendant. Such an interpretation would make Manitowoc liable for any error that might arise during building and installation, directly contrary to the Contract's intent.

Defendant more convincingly addresses the questions of liability in the context of contractual warranties. Manitowoc points out that Hornbeck's project manager admitted that the builder installed the pumps and motors pursuant to the Change Order, and that it was not free to deviate from the contractual requirements without consent and agreement from Hornbeck. *See* Manitowoc's Facts ¶ 16, 32. While the motors certainly failed, Manitowoc did not waiver from the specifications and received the necessary warranty from its supplier, so that it is hard to see how any liability could attach to its actions at installation. Similarly, quite unlike the evidence advanced by Plaintiff, Defendant has produced testimony that goes directly to the important issue at hand: "Manitowoc's workmanship was not the cause of the cargo motor pump problems. Rather, the cause of any problems with the cargo pump motors was the result of (1) defects in the design or manufacture in the motor itself, and/or (2) the specification by Hornbeck of these motors to be used in a manner for which the motors were not suited, namely, above deck and

exposed to the elements." Def.'s Facts Resp. Ex. 5 ¶ 7 ("Mahl Decl."). Plaintiff has provided no countervailing evidence on which the opposite conclusion of causality and attribution of fault might be reached, so while the Mahl Declaration is not dispositive of this issue, it is certainly compelling.

With respect to the testimony of Russell Cardella, Plaintiff tries but fails to maneuver this testimony into its column of support. Hornbeck alleges that Cardella undermines Manitowoc's argument, pointing to his comment that "the installation of this fan-cooled motor on an upper deck of a vessel...is against the IEEE-45 regulations." Parker Supp. Aff., Ex. 4 at 45 ("Cardella Dep."). However, once again Plaintiff obscures the substantive issue without adding to its argument. Cardella also stated that he did not see anything regarding the pump and motor *installation* that caused him concern, that he "looked at the physical installation, the mounting of the motors and that, and I did not see anything that looked awry." *Id.* at 40. These statements are not contradictory, but rather in tandem they support the formulation discussed earlier; that the motors "as installed" were non-compliant because of errors in specification or manufacture, but that Manitowoc nonetheless made no mistake in installing them.

Finally, it is noteworthy that Plaintiff has filed a concurrent suit in the Eastern District of Louisiana seeking civil remedies from U.S. Electrical and Shamosh Equipment based on the same facts at issue here. *See* Parker Aff., Ex. Contract; *Hornbeck Offshore Transp., LLC., v. U.S. Elec. Motors and Shamosh Equip. Corp.*, No. 06-4282 (E.D. La. filed Aug. 14, 2006). While not dispositive of Manitowoc's liability, the fact that Plaintiff has filed an almost identical case claiming that the fault rests with the manufacturers and distributors certainly undermines Plaintiff's argument that questions of causality and blame are clear-cut. The other lawsuit

undercuts Plaintiff's attempt to prove Manitowoc's liability based on the inadequacy of the motors "as installed," as Plaintiff itself seems to believe that Shamosh Equipment and U.S. Electrical Motors are at fault. It is also important to note that, when problems did arise, Plaintiff went first to the supplier and manufacturer for a remedy, rather than Defendant Manitowoc. *See* Parker Aff., Ex. W. This was particularly significant because Plaintiff had the contractual right to demand that Defendant correct errors for which it could be faulted. *See* Contract, art. 11.1.

Defendant has adequately demonstrated that the warranty disclaimers apply to any formulation of Plaintiff's argument supported by the record. Assuming for the sake of summary judgment that the motor problems were caused by a failure to meet the IEEE 45 requirements, Plaintiff has nonetheless provided no evidence that the failure falls outside of the applicable disclaimers. There is therefore insufficient evidence on which a jury could find in Plaintiff's favor with respect to the breach of contract claim.

Summary judgment is therefore GRANTED to Defendant with respect to Count I of the Complaint.

f. Remaining tort claims

Plaintiff has also brought this action under theories of tort liability, for negligence and strict liability. However, these claims cannot be sustained under Wisconsin law, as that state's use of the economic loss doctrine effectively precludes these alternative claims.

As an initial matter, while it is clear that the Contract's choice of law was to be applied to what were clearly contractual questions, determining that Wisconsin law is to be applied to the tort claims is a more involved question. We generally apply the choice of law rules of Illinois as the forum state. *See id.* (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct.

1020, 85 L.Ed. 1477 (1941)).  There is no clear indication that the parties intended for the choice of law clause to extend Wisconsin law to related claims brought under tort.  *See Cerabio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 987 (7th Cir. 2005) (requiring clear indication of intent to dictate law applicable to tort matters).  It is also not clear that the tort claims in this action fall under a possible expansion of the clause's scope based on relatedness.  *See Medline Indus. Inc. v. Maersk Med. Ltd.*, 230 F.Supp.2d 857, 862-63 (N.D. Ill. 2002).

However, even if neither of these standards dictate that the choice of Wisconsin law be extended to tort claims, Illinois asks this Court to apply a "significant relationship" analysis according to which Wisconsin law would still be appropriate.  Under that approach, the law of the place of injury controls unless another state "has a more significant relationship with the occurrence and with the parties," where the significance of the relationship is determined by (1) the place of injury; (2) the place of the tortious conduct; (3) the domicile of the parties; and (4) the place where the relationship between the parties is centered.  *Fredrick v. Simmons Airlines, Inc.*, 144 F.3d 500, 504 (7th Cir.1998) (citing *Esser v. McIntyre*, 169 Ill.2d 292, 214 Ill.Dec. 693, 661 N.E.2d 1138, 1141 (1996)).  The place of injury is arguably unclear, as it is not apparent from the record where the contracted-for motors failed and/or where their impact was felt. However, all other factors point to the propriety of applying Wisconsin law to the tort claims in this case: one of the two parties is domiciled in Wisconsin; the allegedly tortious conduct in the construction of the barges took place in Wisconsin; and the contractual relationship was centered in Wisconsin, where construction and delivery of the barges took place.  Therefore, the law of Wisconsin will be applied to the related tort claims as well as those of a more contractual nature.

Under the economic loss doctrine, the purchaser of a product cannot recover from a manufacturer under tort for damages that are solely economic. *1325 North Van Buren, LLC v. T-3 Group, Ltd.*, 293 Wis.2d 410, 428, 716 N.W.2d 822, 831 (2006) (citing *Kailin v. Armstrong*, 252 Wis.2d 676, 643 N.W.2d 132 (Wis. App. 2002). The doctrine was created by the courts to protect three principles: "(1) to maintain the fundamental distinction between tort law and contract law; (2) to protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk [of] economic loss, the commercial purchaser, to assume, allocate, or insure against that risk." *Id.* (*citing Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis.2d 395, 403, 573 N.W.2d 842 (1998)). Where the economic loss doctrine is triggered, it limits a party to pursuing only contractual remedies. *See Tietsworth v. Harley-Davidson, Inc.*, 270 Wis.2d 146, 163, 677 N.W.2d 233, 241 (2004).

This Court sees nothing in Plaintiff's allegations that would preclude applying the economic loss doctrine; Plaintiff purchased a product with which it found fault and is now seeking economic damages under principles of tort. Plaintiff nonetheless argues that Wisconsin law provides an exception to this rule where the tort claim arises from a duty that would exist independent of the Contract. *See* Pl.'s Resp. at 8-9. In support, Plaintiff cites a variety of court opinions applying Wisconsin law and upholding concurrent tort actions. However, the majority of these cases were decided prior to Wisconsin's adoption of the economic loss doctrine in 1989 and therefore have no bearing on this issue. *See Tietsworth*, 677 N.W.2d at 241 (citing *Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc.*, 148 Wis.2d 910, 921, 437 N.W.2d 213 (1989)). The remaining cases are in no way compelling. *Sokaogon Chippewa Cmty. v. Schenck*, 287 Wis.2d 132, 703 N.W.2d 383 (Table) (Wis. App. 2005), an unpublished decision,

deals with a contract for services rather than a product, and Plaintiff has provided no argument as to why it should nonetheless guide this Court. The remaining case, *Graebner Enters., Inc. v. Fireman's Fund Ins. Co. of Wis.*, 196 Wis.2d 644, 539 N.W.2d 335 (Table) (Wis. App. 1995) – also unpublished – does suggest that distinct tort claims might arise from duties apart from those created by a contract. However, Plaintiff fails to show, other than citation to outdated precedent, how such a distinct duty was at play in this case.

Therefore, the economic loss doctrine precludes Plaintiff's tort claims for economic loss derived from a contractual relationship. For this reason, Defendant's motion for summary judgment is GRANTED with respect to Counts II and III.

g. Additional defenses

Defendant puts forward several additional grounds for summary judgment, alleging that Plaintiff failed to provide timely notice of the problems as required by the Contract, requests remedies that are expressly disclaimed, and never adequately proved that the alleged IEEE 45 failings in fact caused the motors' problems. However, because this Court finds in favor of Defendant on other grounds, we need not address these matters.

4. **CONCLUSION**

Plaintiff made a design determination that the pump motors could be housed on-deck. Realizing that this would mean greater exposure to the elements, Hornbeck then made a specification determination that the motors' seaworthiness could be ensured by requiring that they be IEEE 45 compliant. Manitowoc dutifully carried through with the change in design, and followed through with Hornbeck's specifications in ensuring that any installed motors met the IEEE 45 standard. Whatever twists and turns took place in the selection and supply of those

motors, Manitowoc satisfied its obligations under the Contract and Change Order by ensuring that the motors met that standard. The warranty disclaimer of article 11.4 means that Manitowoc could accept the assurances of a third-party manufacturer that the standard had been met, without opening itself up to liability. While Manitowoc was generally obligated to ensure that all aspects of the Contract were complied with, asking it to have done more in this instance would force it into a design or manufacturing role that would nullify its warranty disclaimer protection.

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED, and Plaintiff's is DENIED.

Enter:

/s/ David H. Coar

_____
David H. Coar
United States District Judge

Dated: **February 11, 2008**